09-5422.121-RSK                                              Sept. 13, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AURELIO RUIZ MARTINEZ,            )
                                  )
                Plaintiff,        )
                                  )
           v.                     )     No. 09 C 5422
                                  )
CHICAGO POLICE OFFICER SHANI SUN, )
CHICAGO POLICE OFFICER TIDWELL,   )
and the CITY OF CHICAGO           )
                                  )
                Defendants.       )

**MEMORANDUM OPINION**

Before the court is the motion for summary judgment of defendants Shani Sun and Sherman Tidwell. For the reasons explained below, we grant the defendants' motion.

**BACKGROUND**

The parties agree on many of the central facts of this civil rights case, but they disagree about a detail that is usually uncontroversial: the plaintiff's name. The plaintiff contends that his name is "Aurelio Ruiz-Martinez" — "Ruiz" is his father's last name and "Martinez" is his mother's maiden name. (See Pl.'s Rule 56.1 Stmt. Of Add'l Facts (hereinafter, "Pl.'s Stmt.") ¶ 2.) We will assume that he goes by that name and refer to him throughout this opinion as "Ruiz-Martinez." But the defendants correctly point out that the hyphen in "Ruiz-Martinez" does not appear in any of the legal documents in the record, including the "Welcome

- 2 -

Notice" that the plaintiff received from the INS when he was granted permanent resident status ("Aurelio R. Martinez"), his social security card ("Aurelio Ruiz Martinez"), and the case caption (same). (See Welcome Notice, dated Aug. 20, 2003, attached as part of Group Ex. M to Pl.'s Stmt., at FCRL000067; Social Security Card, attached as part of Group Ex. M to Pl.'s Stmt., at FCRL000068.) Ruiz-Martinez immigrated to the United States from Mexico in 1989 and was granted permanent resident status in 2002. (Pl.'s Stmt. ¶ 1.) In 1997, he married Annette Arce, who took the last name "Ruiz." (Id. at ¶ 3.) Ruiz-Martinez has lived in Ligonier, Indiana with his wife since 2002. (Id. at ¶ 4.)

On Saturday, September 1, 2007, Ruiz was driving with the plaintiff in the passenger seat when they were stopped by the Indiana State Police ("ISP") near LaPaorte, Indiana. (Id. at ¶ 6.) The state troopers told Ruiz that they had pulled her over because her license plate registration had expired. (Id. at ¶ 7.) Ruiz had the registration stickers in the car's glove compartment, but had forgotten to place them on her license plates. (Id. at ¶ 8.) According to the police report, state trooper Maggie Short entered Ruiz's name and vehicle information into her squad car's on-board computer, which returned information about a "Protection Order." (See Supp. Case Report, dated Sept. 17, 2007, attached as Ex. D to Pl.'s Stmt., at 2-3.) This prompted the state troopers to ask the plaintiff for his identification. (Id. at 3; Pl.'s Stmt. ¶¶ 10-

- 3 -

11.) The case report states that the plaintiff, who appeared "very nervous," gave the state troopers his Indiana driver's license identifying him as "Aurelio Ruiz Martinez." (Supp. Case Report at 3.) Short then entered the plaintiff's information into the computer and discovered a warrant for a man named "Aurelio Martinez" wanted in connection with a 1981 murder committed in Chicago, Illinois. (Id. at ¶ 12.) Ruiz-Martinez insists that his name did not match the murder suspect's, (see id. at ¶ 32), but Short concluded otherwise. (See Dep. of M. Short, attached as Ex. J to Pl.'s Stmt., at 14 (testifying that the name "matched"); Supp. Case Report at 3 (same).) His birth date also matched the murder suspect's, and his height and weight were similar. (Def. Officers' L.R. 56.19(a) Stmt. of Undisputed Facts (hereinafter, "Defs.' Stmt.") ¶ 7.) However, his social security number was different. (Pl.'s Stmt. ¶ 16.) In fact, Ruiz-Martinez is not the person identified in the warrant, as his wife attempted to explain. (See Pl.'s Stmt. ¶¶ 5, 13-15.) Ruiz told the troopers that her husband — who does not speak English — had been mistakenly detained on the same warrant on October 3, 1999 in Ligonier, Indiana. (Id. at ¶ 13.) On that occasion, the officers promptly recognized their mistake after contacting authorities in Chicago and receiving a photograph of the warrant suspect that did not match Ruiz-Martinez. (Id. at ¶ 14.) Apparently, there is no record in Indiana or Illinois of Ruiz-Martinez's mistaken identification in 1999. (Cf.

- 4 -

Group Ex. E to Pl.'s Stmt. (records indicating that the plaintiff was cited for driving without a license without mentioning the warrant issue).) Despite Ruiz's protests, the officers took her husband into custody and notified the Chicago Police Department ("CPD"). (Defs.' Stmt. ¶ 8.)

Upon arrival at the LaPorte County Jail Short contacted defendant Tidwell, a police officer assigned to the CPD's Extradition Unit. (Id. at ¶¶ 4, 9.) Tidwell, or another Extradition Unit officer, faxed Short a copy of the warrant and a CPD bulletin from 1981 containing a picture of the person named in the warrant. (Id. at ¶ 10.) Short concluded that the photograph, which was small ("approximately 2 inches square") and 26 years old by that time, was insufficient to "confirm whether or not Mr. Martinez was their [CPD's] suspect." (Supp. Case Report at 5.) An officer in the CPD's Extradition Unit — apparently not one of the defendants — told Short that the CPD wanted the ISP to detain Ruiz-Martinez on the warrant. (See Defs.' Resp. to Pl.'s Stmt. ¶ 48; see also Supp. Case Report at 5 (stating that a person identified as "Officer Harper" asked the ISP to hold Ruiz-Martinez in LaPorte County Jail while the CPD continued its investigation).) But for that request, the ISP would have released Ruiz-Martinez because he had not been charged with any crime in Indiana. (Pl.'s Stmt. ¶¶ 48-49) Ruiz-Martinez insists that Short also determined that there were "[in]sufficient identifiers to keep him in custody." (Id. at

- 5 -

¶ 49.)  We tend to agree with the defendants that the plaintiff is reading too much into Short's testimony,[1] but the issue is not material: whether Short would have detained the plaintiff if she had been in the defendants' shoes is irrelevant.

The defendants contend that the Extradition Unit merely does the bidding of the CPD's Detective Division and/or the State's Attorney's Office, the entities responsible for investigating and prosecuting the warrant suspect.  (See Defs.' Mem. at 8-10; see also Defs.' Stmt. ¶¶ 12-14.)  However, there is no evidence that any Extradition Unit officer consulted these entities before asking the ISP to detain the plaintiff.  And Defendant Sun — the Extradition Unit's supervising officer — testified that she has the authority to release a suspect held in another jurisdiction.  (See Pl.'s Stmt. ¶ 39; see also Pl.'s Resp. to Defs.' Stmt. ¶ 12.)  As Tidwell explained in his deposition, police officers in the CPD's Extradition Unit use their judgment when deciding whether to detain a person arrested in another state on an Illinois warrant.  (See Tidwell Dep. at 9-10 ("[O]ur job as being police officers in the extradition unit was to just make the basic determination if we had

---

[1] During Short's deposition, plaintiff's counsel asked a leading question that clearly mischaracterized Short's earlier testimony.  (See Short Dep. at 26 ("And prior to the request from the Chicago Police Department, you were prepared to release Mr. Martinez because you didn't think there was sufficient identifiers to keep him in custody, is that correct?").)  After defense counsel objected on that basis, Short gave an ambiguous response: "Wow.  That would be fair to say. And we had no charges on him.." (Id.)  It is unclear whether Short was answering plaintiff's counsel's question, or commenting on the objection.  She evidently believed that there was sufficient identifying information to arrest the plaintiff on the warrant.

- 6 -

good enough reason to detain the individual."); see also id. at 15-20 (testifying about the kinds of identifying information officers consider when making the decision whether to detain a suspect in another jurisdiction — name, gender, height, weight, etc.).) On the other hand, it is effectively undisputed that the Extradition Unit does not make the ultimate decision whether to extradite and prosecute the suspect. (See Defs.' Stmt. ¶¶ 20, 24.) That decision is made by the State's Attorney's Office and/or the Detective Division. (Id.; see also id. at ¶ 12 (officials in the Detective Division and the State's Attorney's Office "can stop the extradition at any point").)

On the day after plaintiff's arrest, the Extradition Unit contacted the Detective Division and asked it to gather the files and reports related to the warrant. (Id. at ¶ 14.) Detective Jude Martinez was assigned to the case and began gathering relevant records. (Id. at ¶ 15.) Because the warrant was issued in 1981, computerized records were unavailable and some records were missing. (Id. at ¶ 16.) On that same day — September 2, 2007 — the plaintiff's wife contacted Tidwell and delivered several documents that she claimed proved that her husband was not the person named in the warrant. (Id. at ¶ 18.) Ruiz testified that she gave Tidwell her husband's passport, his "resident card," "his social security card," two "welcome notices" he had received from the INS, and a letter verifying his employment in Indiana. (See

Ruiz Dep., attached as Ex. B to Pl.'s Stmt., at 31.) Defendant Sun returned to work after the Labor Day holiday on September 4, 2007 and reviewed the documents that Ruiz had given Tidwell. (Defs.' Stmt. ¶ 19.) None of the documents established the plaintiff's whereabouts in 1981. (Id.) Sun began preparing a report for the State's Attorney's Office asking it to review the case and advise whether it was going to seek the plaintiff's extradition. (Id. at ¶ 20.) While she was preparing the report, Sun received a fax from the ISP advising her that Ruiz-Martinez had waived extradition. (Id. at ¶ 21.) The plaintiff contends that no one explained the waiver forms to him in Spanish and that he believed that he would not be released unless he signed the waiver. (See Pl.'s Stmt. at 41-42.) But the ISP told Sun that it had properly advised the plaintiff:

> Holding subject Martinez, Aurelio R. DOB 9/25/1955, [] on your charges, your charges only. A signed Waiver of Extradition has been signed and is attached with this fax along with a booking photo. Be advised his rights of Extradition were explained to him in Spanish, and he understood what he was signing. Please advise earliest possible date and time of pick up.

(Fax from Deputy B. Nurnberg to Sun, dated Sept. 4, 2007, attached as Ex. 9 to Defs.' Stmt.) In an attempt to establish that the defendants had a hand in obtaining his waiver, the plaintiff contends that Sun told his wife that extradition could take as long as 90 days if he did not execute a waiver. (Pl.'s Stmt. ¶ 34.) However, there is no evidence that Sun's statement affected his

- 8 -

decision to waive extradition. The testimony that plaintiff relies on concerns a note that Sun wrote to her file documenting a conversation that she had with Ruiz on September 7, 2007, three days after her husband had waived extradition. (See Sun Dep. at 63; see also Notes dated Sept. 7, 2007, attached as part of Group Ex. M to Pl.'s Stmt., at FCRL000028.) According to Sun, the CPD had 30 days after Ruiz-Martinez's waiver to take him into their custody, although she was unable to identify a specific source for that requirement. (Defs. Stmt. ¶ 23.)

On September 5, 2007, the State's Attorney's Office confirmed that it wished to proceed with plaintiff's extradition and told Sun that the Detective Division would soon provide a date when someone was available to travel to Indiana to take the plaintiff into custody. (Id. at ¶ 24.)[2] Meanwhile, Ruiz continued to protest her husband's innocence, (see Pl.'s Stmt. 23), although apparently she did not provide any further documentation substantiating her claim that her husband was not the person named in the warrant. We accept as true for purposes of this motion that Sun was insulting and dismissive in her conversations with Ruiz. (See Pl.'s Stmt. at ¶¶ 28-29; cf. Defs.' Resp. to Pl.'s Stmt. at 28-29.)

Ruiz-Martinez contends that, in violation of CPD procedures, the defendants failed to consider (or discover) several pieces of information relevant to the warrant. (See Pl.'s Stmt. ¶¶ 17-19,

---

[2] Neither side indicates whether Sun told the State's Attorney's Office about the materials that Ruiz had given to Tidwell.

35-38; see also CPD Special Order S06-12-04 ("Extradition Procedures"), attached as Ex. H to Pl.'s Stmt., at 3 ("When a person being held by an out-of-state jurisdiction is wanted on a Chicago warrant, the extradition officer will . . . prepare the required court documents, fugitive warrants, complaints, police reports, records and photographs to facilitate the extradition . . . .").) First, he points out that neither Tidwell nor Sun could recall seeing a particular photograph of the 1981 murder suspect — larger than the one that Tidwell faxed to the ISP — that was "in CPD possession in 2007." (Pl.'s Stmt. ¶ 17.) They also did not know whether the photograph was provided to Indiana authorities. (Id.) Second, CPD reports indicate that in 1981 a suspect was detained on the same warrant in Mercedes, Texas. (Id. at ¶¶ 24-25.) A judge in Texas declined to extradite the suspect, identified in the reports as "Baudelio Martinez," because "there was not enough information to identify the arrested suspect as Martinez . . . ." (Supp. Report, attached as part of group Ex. M to Pl.'s Stmt., at FCRL000138.) The report states that the judge turned the suspect over to immigration authorities to be deported to Mexico and that the investigating detectives requested that the case be closed on that basis. (Id.) A separate CPD report indicates that in 1985 another suspect was detained on the warrant in Laredo, Texas. (See Supp. Report, attached as part of group Ex. M to Pl.'s Stmt., at FCRL000094.) That report states that authorities in Texas again declined to authorize extradition and

- 10 -

that the investigating detective requested that the case remain "EXCEPTIONALLY CLEARED/CLOSED." (Id.; see also Stop Order or Cancellation Request, attached as part of group Ex. M to Pl.'s Stmt., at FCRL000004.) The warrant was later "re-issued" in 2002. (Pl.'s Stmt. ¶ 24.) Tidwell testified that he does not know whether the CPD reports concerning the suspect's deportation, and the cancellation of the warrant, were contained in the Extradition Unit's file in 2007. (Pl.'s Stmt. ¶ 26.) However, Tidwell spoke to Short about the 1985 incident shortly after the plaintiff's arrest. (See Pl.'s Stmt. ¶ 47; see also Supp. Case Report at 4 (stating that Tidwell told Short that a subject named "Aurelio Ruiz" was detained in 1985 in Laredo, Texas.).)[3]

On September 18, 2007, Detective Martinez, his partner, and an Assistant State's Attorney traveled to the jail in LaPorte, Indiana to pick up Ruiz-Martinez. (Defs.' Stmt. ¶ 27.) Because Martinez had recently been assigned to two murder investigations, this was the soonest he could travel to Indiana to take the plaintiff into custody. (Id. at ¶ 25.) The plaintiff contends that Martinez apologized to him, expressed disbelief that he had been detained so long in light of the documents that his wife had given the CPD, and made similar comments to his wife. (See Pl.'s Stmt. ¶¶ 40, 43-44; cf. Defs.' Resp. to Pl.'s Stmt. ¶¶ 40, 43-44 (denying that Martinez

---

[3]/ Neither side remarks on the reference to "Aurelio Ruiz" in Short's incident report. However, it appears to have been a mistake because the name "Ruiz" does not appear in the records relevant to the 1985 arrest in Laredo.

- 11 -

made those statements.)   Once in Chicago, Ruiz-Martinez participated in a lineup before a witness to the 1981 crime and provided a buccal swab to detectives for DNA testing. (Defs.' Stmt. ¶¶ 29-31.)  On September 19, 2007, plaintiff appeared before a judge for the first time and was released on an "I-bond," which Martinez believes is unusual for a fugitive murder suspect. (Id. at ¶ 32; see also Pl.'s Stmt. ¶ 51.)  On October 10, 2007, the case against the plaintiff was dismissed. (Defs.' Stmt. ¶ 33.)

## DISCUSSION

Ruiz-Martinez has sued Tidwell and Sun under 42 U.S.C. § 1983 for violating his due process rights under the Fourteenth Amendment.  He has also sued the City of Chicago under Monell v. Department of Social Services of City of New York, 436 U.S. 659 (1978).  The parties apparently dispute the effect of City's "Certification of Entry of Judgment" on that claim. (See Pl.'s Resp. to Defs.' Stmt. ¶¶ 2, 40.)  We express no opinion on that issue at this time because the plaintiff's Monell claim is not before us: only Tidwell and Sun have moved for summary judgment. They argue that the undisputed facts establish that they did not participate in a constitutional violation and, in the alternative, they assert qualified immunity for their actions.

## A.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

- 12 -

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

**B. Plaintiff's Fourteenth Amendment Claim**

Ruiz-Martinez, relying on Baker v. McCollan, 443 U.S. 137 (1979) and its progeny, contends that his mistaken arrest and prolonged detention violated the Fourteenth Amendment. In Baker, the plaintiff's brother was arrested on drug charges in Potter County Texas. Id. at 140. With the help of a forged driver's license, he persuaded the authorities there that he was actually the plaintiff. Id. He was processed and released on bail as the

- 13 -

plaintiff, and a warrant was later issued for his arrest under the plaintiff's name. Id. at 141. When the plaintiff was later stopped for a minor traffic violation in Dallas a routine warrant check revealed that he (really his brother) was wanted in Potter County. Id. at 141. He was held for several days in Dallas until Potter County deputies took him into their custody. Id. He was held in Potter County jail for another three days over the New Years holiday (December 30, 1972 to January 2, 1973). Id. At that time officials consulted a file photograph of the person named in the warrant (i.e., the plaintiff's brother), concluded that they were holding the wrong person, and released the plaintiff. Id. The plaintiff sued the Potter County sheriff under 42 U.S.C. § 1983 for "the intentional failure to investigate and determine that the wrong man was imprisoned." Id. at 143. The Supreme Court concluded the plaintiff's claim did not implicate the Fourth Amendment because he did not challenge the warrant or his initial arrest. See id. at 144 ("Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment."). Instead, the Court analyzed the plaintiff's claim under the Fourteenth Amendment:

> Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. For the Constitution likewise guarantees an accused the right to a speedy trial, and invocation of

> the speedy trial right need not await indictment or other
> formal charge; arrest pursuant to probable cause is
> itself sufficient. . . . We may even assume, *arguendo*,
> that, depending on what procedures the State affords
> defendants following arrest and prior to actual trial,
> mere detention pursuant to a valid warrant but in the
> face of repeated protests of innocence will after the
> lapse of a certain amount of time deprive the accused of
> "liberty . . . without due process of law." But we are
> quite certain that a detention of three days over a New
> Year's weekend does not and could not amount to such a
> deprivation.

Id. at 144-45 (internal citation and footnote omitted). The Court

went on to reason that the plaintiff's "innocence of the charge

contained in the warrant, while relevant to a tort claim of false

imprisonment in most if not all jurisdictions, is largely

irrelevant to his claim of deprivation of liberty without due

process of law. The Constitution does not guarantee that only the

guilty will be arrested." Id. at 145. The question instead is

whether the plaintiff has received due process, which "does not

require that every conceivable step be taken, at whatever cost, to

eliminate the possibility of convicting an innocent person." Id.

A sheriff executing an arrest warrant is not "required by the

Constitution to investigate independently every claim of

innocence," or to perform an "error-free" investigation of such

claims. Id. at 145-46. "The ultimate determination of such claims

of innocence is placed in the hands of the judge and the jury."

Id. at 146; see also id. at 145 ("A reasonable division of

functions between law enforcement officers, committing magistrates,

and judicial officers — all of whom may be potential defendants in a § 1983 action — is entirely consistent with 'due process of law.'").

There are at least two lines of authority originating in Baker's dicta that are relevant to Ruiz-Martinez's claim. In our opinion denying the defendants' motion to dismiss, we relied on the Sixth Circuit's decision in Gray v. Cuyahoga County Sheriff's Dept., 150 F.3d 579, 582-83 (6th Cir. 1998), which dealt with a plaintiff's 41-day detention pursuant to an out-of-state warrant. The Gray court concluded that the defendants' failure to consult photographic evidence clearly indicating that the plaintiff was not the person named in the warrant could support a § 1983 claim. Id.; see also Baker, 443 U.S. at 148 (Blackmun, J. concurring) ("I do not understand the Court's opinion . . . to foreclose the possibility that a prisoner in respondent's predicament might prove a due process violation by a sheriff who deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints."). As the Sixth Circuit framed the issue on remand, "the principal question for the trier of fact will be whether [the defendants] acted with something akin to deliberate indifference in failing to ascertain that the [person] they had in custody was not the person wanted by the Michigan authorities on the outstanding parole-violation warrant." Gray, 150 F.3d at 583; see also Romero v. Fay, 45 F.3d

- 16 -

1472, 1480-81 (10th Cir. 1995) ("Defendants' failure to contact Plaintiff's alibi witnesses and the individuals who witnessed David Benavidez threaten David Douglas did not display deliberate or reckless intent to falsely imprison Plaintiff."); Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992) (concluding that Baker did not foreclose a lawsuit based on the plaintiff's allegation that the defendant "failed to release him even after he knew (or should have known) that Sanders had been misidentified."). The second line of authority, discussed in more detail infra, holds that the Constitution requires a timely appearance before a judge following an arrest pursuant to a warrant. See Coleman v. Frantz, 754 F.2d 719, 725 (7th Cir. 1985); Armstrong v. Squadrito, 152 F.3d 564, 571-82 (7th Cir. 1998).

### 1. The Plaintiff's Initial Detention and the Defendants' Investigation of His Claim of Mistaken Identity

Assuming for the moment that the two defendants were responsible for Ruiz-Martinez's initial detention — recall that Short's report identifies "Officer Harper" as the person who asked her to detain the plaintiff on the warrant — that decision was clearly reasonable in light of the evidence available at that time. The plaintiff's name, birth date, and physical characteristics matched the person named in the warrant. Cf. Patton v. Przybylski, 822 F.2d 697, 699-700 (7th Cir. 1987) (officer acted reasonably in arresting the plaintiff where his name, race, and birth year matched the warrant suspect's); Brown v. Patterson, 823 F.2d 167,

169 (7th Cir. 1987) (officer acted reasonably in arresting the plaintiff whose name matched an alias used by the warrant suspect). After they were notified of the plaintiff's arrest, officers in Chicago's Extradition Unit sent a photograph of the warrant suspect to the ISP. Cf. Johnson v. City of Chicago, 711 F.Supp. 1465, 1470 (N.D. Ill. 1989) (denying a motion to dismiss where the plaintiff alleged that the defendants failed to take "even minimal steps to determine whether they had the right person"). Short determined that the photograph was inconclusive. It was certainly reasonable for officers in the Extradition Unit to request Ruiz-Martinez's detention at that point. The following day Ruiz gave Tidwell documents that she believed demonstrated the CPD's mistake, which Sun reviewed when she returned to work following the Labor Day holiday. Those materials, while relevant to Ruiz's contention that her husband was not the person identified in the warrant, are not conclusive. The fact that he was granted legal permanent resident status in 2002 does not rule out the possibility that he committed a murder in this country 21 years earlier.

Ruiz-Martinez points out that the defendants failed to consider other potentially relevant information: (1) "a certain photograph of the 1981 murder suspect in CPD possession in 2007," (Pl.'s Stmt. ¶ 17); (2) the circumstances surrounding the detention and deportation of another suspect in Texas on the same warrant in 1981, (id. at ¶¶ 24-26, 37, 47); and (3) the fact that Ruiz-

- 18 -

Martinez had been picked up on the same warrant eight years earlier, (id. at ¶¶ 13-14, 27, 52). First, there is not enough evidence in the record to establish that the defendants recklessly disregarded this evidence. The fact that the photograph was "in CPD possession in 2007" does not mean that these defendants were reckless (or even negligent) in failing to uncover it. Second, the information does not conclusively establish that Ruiz-Martinez was not the person named in the warrant. The cited photograph is larger than the one that Tidwell sent to the ISP, but it is still difficult to discern the suspect's features. Moreover, it depicts the suspect as he appeared 26 years prior to the plaintiff's arrest. Detective Martinez testified that during his investigation he compared this photograph with a photograph of the plaintiff and was unable to determine "if it was the same person or not." (Martinez Dep. at 37.)[4] So, this is not a case like Gray where the defendants ignored photographic evidence clearly showing that they were holding the wrong person. Cf. Gray, 150 F.3d at 582-83 ("There is no dispute that Fuerst and Ussery were in possession of a photograph that bore virtually no resemblance to Gray, as well as a physical description detailing certain permanent scars that Gray did not have."). The person detained in Texas in 1981 may or may not have been the murder suspect, and even if he was, it would not

---

[4] There are photographs of the plaintiff in the record, but he does not even attempt to argue that they support his claim. Based on our own inspection, we do not believe that the differences between the photographs of the plaintiff and the suspect are sufficient to create a triable issue.

- 19 -

be surprising if he had reentered the United States and returned to an area near Chicago.[5]  Finally, there is apparently no record in Indiana or Illinois of Ruiz-Martinez's mistaken detention in 1999. The defendants had only Mrs. Ruiz's statement that her husband had been mistakenly detained, which they were not required to believe.[6] The defendants' investigation may have been flawed, but as the Supreme Court explained in Baker, the Constitution does not require police officers to perform "error-free" investigations.  See Baker, 443 U.S. at 145-46.  We conclude that the defendants are entitled to summary judgment insofar as the plaintiff's claim is that the defendants should have discovered their error earlier.  See id. at 146 ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

**2.    The Plaintiff's Prolonged Detention Without an Appearance Before a Judge**

Ruiz-Martinez was detained for 18 days before he was brought before a judge.  Our Court of Appeals, relying on Baker's dicta, has recognized "a constitutional right to a timely first appearance

---

[5]    Ruiz-Martinez and his wife were stopped by the ISP near LaPorte, Indiana on their way to a family picnic in Chicago.  (Pl.'s Stmt. ¶ 6.)

[6]    The failure of any official to create a record of the plaintiff's mistaken detention in 1999 is the most troubling aspect of this case.  A simple notation in the warrant file with Ruiz-Martinez's identifying information would likely have prevented his 18-day ordeal.  But he has not cited any evidence that the defendants were involved in his 1999 arrest.

under the Due Process Clause." <u>Coleman</u>, 754 F.2d at 725. In <u>Coleman</u>, a state court issued a bench warrant for the plaintiff's arrest for receiving stolen property and set bond at $10,000. <u>Id.</u> at 721. The plaintiff turned himself in to the county jail, where the sheriff detained him for not making bail. <u>Id.</u> He was held for 18 days and during his incarceration protested his innocence and asked several times when he was going to court. <u>Id.</u> The sheriff repeatedly called the prosecutor's office to arrange the defendant's "first appearance" without any response until the prosecutor told him to release the plaintiff, which he promptly did. <u>Id.</u> at 721-22. The <u>Coleman</u> Court reasoned that under <u>Baker</u> "the duration of the detention and the burden placed on state officials in providing procedural safeguards are highly relevant to a constitutional examination of post-arrest detentions." <u>Id.</u> at 724. The challenged detention in <u>Baker</u> was relatively short (three days) and "could only have been prevented by the institution of significant and burdensome investigative procedures by the defendant sheriff." <u>Id.</u> By contrast, the plaintiff in <u>Coleman</u> was held for 18 days despite his repeated requests to go to court. <u>Id.</u> Moreover, most states provide for a first appearance before a judge or a magistrate to, among other things, ensure that the person being detained is the person named in the complaint. <u>See id.</u> at 721 n.1. "Where first appearances are provided, the requirement that they be timely would place a relatively small burden on law

enforcement and judicial officers." Id. The Court observed that a defendant's first appearance implicates several constitutional rights, (e.g., the defendant is informed of the charges against him and of his right to counsel), which are substantially undermined if the first appearance is unreasonably delayed. Id. The Court declined to set any precise time limits, id., but held that an 18-day detention without an appearance before a judge or magistrate "is wholly inconsistent with notions of 'fundamental fairness' required of criminal prosecutions under the Due Process Clause . . . and with the concept of 'ordered liberty.'" Id. at 723 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984) and Palko v. Connecticut, 302 U.S. 319, 325 (1937) (internal citations omitted). The court went on to observe that it was "doubtful" that the plaintiff had carried his burden to show that the sheriff caused the due-process violation, but resolved the case instead on the basis of qualified-immunity. Id. at 725. The sheriff's conduct, "based on objective circumstances, was reasonably undertaken pursuant to the performance of his duties and within the scope of his authority." Id. at 728. Also, the right recognized in Coleman was not clearly established when the plaintiff was detained. Id. at 731.

Our Court of Appeals revisited Coleman in Armstrong. In Armstrong, the plaintiff was held on a "body attachment warrant" for 57 days despite his repeated inquiries about when he would be

taken to court. Id. at 568. The plaintiff had voluntarily surrendered and likely would have been brought before a judge much sooner if the warrants division had not transposed two digits in the case number when it notified the court that it was holding the plaintiff. Id. at 567-68. The warrants division's error meant that the court did not know that the plaintiff was being held, and therefore did not call him to court. Over the next 57 days guards dismissed the plaintiff's repeated inquiries about when he would be taken to court and refused to accept his written "Inmate Request Forms" pressing the same question. Id. at 568. Although the plaintiff was held on a civil warrant for civil contempt, the Court concluded that procedures governing such warrants were analogous to criminal warrants. Id. at 573-75. Therefore, Coleman's analysis of the constitutional interests at stake applied with equal force. Id. And like the plaintiff in Baker, the plaintiff in Armstrong repeatedly protested his confinement. Id. at 575-76. The Court then asked whether the defendants' conduct exhibited "deliberate indifference" to the plaintiff's rights. Id. at 577. Most relevant to the current motion, the Court concluded that the defendants were not entitled to summary judgment on the plaintiff's claim against the guards at the jail where he was confined. Id. at 580. His repeated protests about his confinement supported "an inference that the guards knew of a serious risk. For the guards to have continued to refuse Armstrong's complaints and for them to

have continued only to check the will call list evinces the serious possibility of deliberate indifference to Armstrong's plight." Id. The Court went on to reject the guards' claims of qualified immunity because "Coleman clearly establishes a right to a prompt appearance after arrest pursuant to a warrant." Id. at 582.

Unlike the plaintiffs in Coleman and Armstrong, Ruiz-Martinez was detained in Indiana pursuant to an out-of-state warrant. "The obligation imposed on states to extradite fugitives from justice within its borders to the state from which he has fled upon proper demand from that state is rooted in the Constitution." McBride v. Soos, 594 F.2d 610, 612 (7th Cir. 1979); see U.S. Const. Art. 4, § 2, cl. 2. The federal statute implementing this obligation provides procedural safeguards protecting the rights of alleged fugitives. McBride, 594 F.2d at 612 (citing 18 U.S.C. § 3182). "Before an individual can be extradited, the governor of the asylum state must determine: (1) whether the person demanded is substantially charged with a crime; and (2) whether the person demanded is a fugitive from justice from the state making the demand." Id. In addition to these safeguards, both Indiana and Illinois have enacted the Uniform Extradition Act, which provides further procedural protections. See Ind. Code 35-33-10-3; 725 ILCS 225/1 et seq. Indiana's version of the Act describes three situations in which a person may be arrested for a crime committed in another state: (1) an arrest pursuant to a warrant issued by

Indiana's governor based upon a demand for extradition from the executive authority of another state, <u>see</u> Ind. Code 35-33-10-3(8)-(10); (2) an arrest pursuant to a warrant issued by an Indiana judge, <u>see</u> Ind. Code 35-33-10-3(14); and (3) an arrest "by an officer or private citizen without a warrant upon reasonable information that the accused stands charged in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one (1) year," <u>see</u> Ind. Code 35-33-10-3(15). In this case, no Indiana warrant was ever issued for Ruiz-Martinez's arrest. He was arrested because a computer search returned an Illinois murder warrant for an individual with plaintiff's name and birth date. <u>See</u> Ind. Code 35-33-10-3(15). Accordingly, he was entitled under Indiana law to an appearance "before a judge with all practicable speed," where a complaint would be filed against him setting forth the grounds for his arrest. <u>Id.</u> The presiding judge would then decide whether he was "the person charged with having committed the crime . . . ." Ind. Code 35-33-10-3(16). If so, the judge would have committed him to jail for an unspecified time period long enough to permit his arrest pursuant to a governor's warrant. <u>See id.</u>; <u>see also</u> Ind. Code 35-33-10-3(18) (providing that the judge may impose a second unspecified period of confinement if the initial period lapses before the governor issues

a warrant).[7]  If the governor had issued such a warrant, Ruiz-Martinez would have been entitled before his extradition to challenge his detention by applying for a writ of habeas corpus. See Ind. Code 35-33-10-3(11).

The defendants — two Chicago police officers — are not responsible for implementing Indiana's extradition laws.  In McBride v. Soos, 679 F.2d 1223, 1227 (7th Cir. 1982), our Court of Appeals held that two Indiana police officers who transported the plaintiff from Missouri to Indiana pursuant to an extradition warrant were not liable for the failure of Missouri officials to comply with Missouri's extradition statute.  "It is unreasonable to require the demanding state agents to be familiar with the procedural safeguards enacted in the asylum state's extradition statutes and then further require them to ensure that the statutory safeguards have been followed." Id. Here, the police officers in Indiana — not the defendants — were responsible in the first instance for bringing Ruiz-Martinez before a judge to determine whether he was in fact the person named in the warrant.  It appears that they did not do so because he waived extradition on September 4, 2007, which was likely the first day that the courts were open

---

[2/] Because Ruiz-Martinez was being held on murder charges, he would not have been eligible for release on bond if the judge had confined him pending a governor's warrant.  See I.C. 35-33-10-3(17) (the judge must "admit the person arrested to bail by bond or undertaking" unless the prisoner is charged with an offense punishable by death or life imprisonment); see also 720 ILCS 5/9-1 (providing that a person convicted of first degree murder may be sentenced to life imprisonment).

- 26 -

following his arrest.[8]  An alleged fugitive who waives extradition has "neither a constitutional nor a statutory right to specific extradition procedures." <u>Scull v. New Mexico</u>, 236 F.3d 588, 596 (10th Cir. 2000) (cited with approval in <u>Schreiber v. Buncich</u>, No. 05-3243, 2006 WL 565894, *3 (7th Cir. Mar. 6, 2006)).  Ruiz-Martinez claims that the officers in Indiana did not explain the forms to him in Spanish, but there is no evidence that either of the defendants controlled what information Indiana officers conveyed to him.  In fact, Sun was told that the ISP *had* explained the forms to Ruiz-Martinez in Spanish.  (<u>See</u> Fax from Deputy B. Nurnberg to Sun, dated Sept. 4, 2007 ("Be advised his rights of Extradition were explained to him in Spanish, and he understood what he was signing.").)  The plaintiff also contends that Sun told his wife that "if her husband did not sign an extradition waiver, extradition could take 90 days." (Pl.'s Stmt. ¶ 34; <u>cf.</u> Sun Dep. at 64 ("I explained to her to the best of my ability the extradition procedure, and explained to her that if her husband did not sign the waiver we still have 90 days to get a governor's warrant to get him extradited back to the State of Illinois.").) There is no evidence that this information was relayed to Ruiz-Martinez, or even that it was inaccurate.  It appears that Sun was referring to the procedures governing an arrest in Illinois on an

_____

[8]  Ruiz-Martinez was arrested on the Saturday before the Labor Day holiday.

out-of-state warrant. Although both Illinois and Indiana have adopted the Uniform Extradition Act, only Illinois's version sets a specific limit on the time that an arrestee may be detained pending a governor's warrant: 30 days initially, subject to a 60-day extension if the governor has not yet issued a warrant. See 725 ILSC 225/15 & 225/17; cf. Ind. Code 35-33-10-3(16), (18). Potentially, Ruiz-Martinez could have been held even longer under Indiana's statute. Moreover, as we discussed infra, the plaintiff is relying on Sun's testimony about a conversation that she had with Ruiz on September 7, 2012. By that time, her husband had already executed documents waiving extradition. Even assuming that Ruiz-Martinez's waiver was coerced, or at least uninformed, there is no evidence that the defendants are responsible.

Neither side has cited, nor are we aware of, any case or statute establishing limits on the time that a suspect may be detained following a waiver of extradition. The significant delays built into the extradition process tend to undercut plaintiff's argument that his 18-day detention violated the Constitution. As we just discussed, an alleged fugitive may be held for a significant period of time pending a governor's warrant for his arrest and extradition. In addition, under the federal extradition statute, a formal demand for extradition triggers a 30-day period for agents in the demanding state to take custody of the alleged fugitive. See 18 U.S.C. § 3182. Chicago police officers took

- 28 -

custody of Ruiz-Martinez in approximately half that time. On the other hand, it appears that Ruiz-Martinez was held for an additional two weeks after he waived extradition merely because it was inconvenient for the investigating detective to pick him up sooner. The defendants suggest that the matter was out of their hands once the State's Attorney's Office indicated on September 5 that it wished to proceed with Ruiz-Martinez's prosecution. But the Extradition Procedures attached to the plaintiff's response indicate that extradition officers are responsible for "direct[ing] the police personnel effecting the fugitive['s] return." (See Extradition Procedures at 3.) Sun called the Detective Division on September 5 to get a date for plaintiff's pick up. (Sun Aff., attached as Ex. 7 to Def.'s Stmt., ¶ 17.) She waited nine days for a response, apparently without any further effort to expedite the plaintiff's transfer. (See id. at ¶ 18 (stating that "[o]n or about September 14 [she] was told that the Detectives were available to pick up Plaintiff on September 18"); cf. Coleman, 754 F.2d 721-22 (sheriff "repeatedly" called the prosecutor's office to arrange the plaintiff's first appearance).[9]

---

[9]/ On the other hand, we do not believe that the record supports the plaintiff's suggestion that Sun maliciously delayed Ruiz-Martinez's appearance before a judge. For purposes of the defendants' motion, we accept as true his contention that Sun told Ruiz that "she's going to go [pick up the plaintiff] when she feels like doing it." (Ruiz Dep., attached as Ex. B to Pl.'s Stmt., at 41.) But there is no evidence that Sun in any way delayed Detective Martinez's trip to Indiana. It is undisputed that September 18, 2007 was the earliest date that the investigating detectives were available to pick up the plaintiff. (See Pl.'s Resp. to Defs.' Stmt. ¶ 25.)

However, we need not decide this difficult constitutional question because it is apparent that the defendants are entitled qualified immunity. "Determining whether qualified immunity applies to the actions of a public official involves a two-part inquiry: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation." McComas v. Brickley, 673 F.3d 722, 725 (7th Cir. 2012). We will proceed directly to the second question. See id. (the court may address the elements of qualified immunity "in any order") (citing Pearson v. Callahan, 555 U.S. 223, 236-42 (2009)). It is the plaintiff's burden to establish that the asserted right was "clearly established." Spiegel v. Cortese, 196 F.3d 717, 723 (7th Cir. 1999). "A violation may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional." Siebert v. Severino, 256 F.3d 648, 654-55 (7th Cir. 2001). The ISP — not the defendants — had a duty to bring Ruiz-Martinez before a judge in the first instance. As far as the defendants knew, Ruiz-Martinez validly waived that right. In light of that waiver, and the lengthy detentions permitted by the extradition process, it would not have been obvious to CPD officials that they had a

- 30 -

constitutional duty to bring Ruiz-Martinez before an Illinois judge sooner than they did. Second, the plaintiff has not cited any cases addressing this issue. As <u>Coleman</u> and <u>Armstrong</u> indicate, the procedures governing a particular suspect's detention are highly relevant to the existence of a Fourteenth Amendment violation. Accordingly, cases establishing the general right to a timely appearance before a judge are not "closely analogous" to our case involving detention pursuant to an out-of-state warrant. Therefore, we conclude that the defendants are entitled to qualified immunity.

### CONCLUSION

The defendants' motion for summary judgment [71] is granted. We conclude that the defendants are entitled to summary judgment on the merits of the plaintiff's claim that they were deliberately indifferent to evidence indicating plaintiff's innocence. We conclude that the defendants are entitled to qualified immunity with respect to the plaintiff's claim that they were responsible for the 18-day period before plaintiff was brought before a judge.

DATE:          September 13, 2012

ENTER:         _____
               John F. Grady, United States District Judge